**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JOHN BOGOSKI, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 13-4753 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | : | |
| | : | |
| Defendants. | : | |

PISANO, District Judge.

Presently before the Court is an appeal by John Bogoski ("Plaintiff") from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his request for a Disability Insurance Benefits ("DIB").  The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §§ 405(g), and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, this matter is remanded for further proceedings consistent with this Opinion.

### I.    Procedural History

Plaintiff submitted an application for DIB on July 29, 2009, alleging disability as of January 2009 due to discogenic disorders of the back.  *See* Administrative Record ("AR") 71. The Commissioner denied his claims both initially and on reconsideration. *Id.* at 75–79, 80–81, 85–88. Plaintiff appealed, and on March 16, 2012, a hearing was held before an Administrative Law Judge ("ALJ").  *See* Compl. ¶ 6; AR 22.  On March 29, 2012, the ALJ issued a written decision denying Plaintiff's claim.  Compl. ¶ 7; AR 8–18.  Plaintiff requested that the Appeals Council review of the ALJ's decision; on September 19, 2012, the Appeals Council denied review, whereby the ALJ's

decision became the final decision of the Commissioner.  Compl. ¶ 7. Subsequently, Plaintiff

appealed the decision to this Court.

## II.      Background

Plaintiff was born in April 1973.  He lives with his wife and two children in Union, New

Jersey.  AR 145.  He completed twelve grade in 1991, and received specialized training for diesel

and automotive repair as well as appliance repair in 2000.  *See* AR 133, 140.  Plaintiff previously

worked as a mechanic for a car company from 1990 to 2001.  *See* AR 130, 137–38, 141–44.  He

then worked for the PSE&G utility as a motor vehicle service specialist form March 2001 to

January 2009.  *Id.*  In this capacity, Plaintiff did labor, repair and maintenance and replacement of

gas services.  He also did fleet maintenance.  *Id.* at 31.  This job required standing and walking for

eight hours a day and lifting heavy objects weighing as much as 75 to 100 pounds.  *Id.* at 130, 137–

38, 141–44.

Before and after the alleged disability onset date, Plaintiff saw a number of treating

physicians and medical professionals.  Plaintiff also saw additional medical professionals in

connection with his application for disability benefits.  The relevant findings for this appeal are

detailed below.

### A.      *Review of the Relevant Medical Evidence*

In December 2007, Plaintiff was involved in a work-related accident in which he was struck

by a backhoe.  *See* AR 154.  Plaintiff had a past history of back injury that had also occurred in

August 2006, when he was injured when a ceiling had caved in at work.  Plaintiff was treated with

physical therapy and epidural steroid injections.  This December 2007 accident aggravated the

preexisting back pain.  *See id.*

On January 31, 2008, Plaintiff sought treatment with Dr. Barry Sloan ("Dr. Sloan") because

of headaches, neck pain radiating to the right upper extremity, and back pain radiating to both

buttocks and lower extremity due to the December 2007 accident.  Plaintiff also complained of severe pain and weakness in his right shoulder, and that his limbs "fell asleep."  AR 154.  On examination, Dr. Sloan found bilateral paravertebral muscle spasms in the cervical spine and mid-thoracic region.  The cervical foraminal compression test was positive bilaterally and range of motion of the cervical spine was limited to forty percent in all directions with marked tenderness at the extremes of motion.  There was diminished sensation in the right C5-C6 and C6-C7 dermatomes as compared to the left, and diminished sensation of the L5 and left S1 dermatomes.  Dr. Sloan found marked weakness of the right deltoid in abduction and right biceps flexion.  Range of motion of the right shoulder was performed to 65% with tenderness and weakness at the extremes, and range of motion of the thoracic region was limited to 50% with tenderness at the extremes of motion.  There was a positive impingement sign in the right shoulder with radiation down to the upper right extremity.  Dr. Sloan found that the lumbar region was tender at the left sacrosciatic notch and over the left L4-L5 and L5-S1 interspaces.  A straight leg raising test was positive on the left at thirty degrees with radiation of pain, numbness, and tingling down the left lower extremity.  X-rays were taken, but Dr. Sloan found no gross fractures.  After the examination, Dr. Sloan recommended physical therapy treatment, and prescribed Lidoderm patches along with the Percocets Plaintiff was already taking for the pain.  *See* AR 154–55.

In February 2008, Plaintiff sought treatment with Dr. Nazar Haidri.  While Plaintiff returned to work on February 19, 2008, he complained that prolonged sitting and standing, bending down, or lifting heavy objects aggravated his back pain.  He had difficulty sleeping at times from pain.  His right shoulder pain was aggravated when he reaches with his right arm, and he had difficulty gripping with both hands.  Dr. Haidri noted that he walked slowly due to pain.  His right shoulder movements were painful and he had a slight decreased grip strength in his right hand.  He had decreased pinprick over parts of his right leg and his left foot.  Dr. Haidri found that there was

tenderness to percussion of the dorsal, lumbar, and cervical spine, and spasm in the lumbar paravertebral spine muscles.  Forward flexion of the lumbar spine was limited by ten degrees, and Tinel's sign was positive over the median nerve of both wrists.  *See* AR 169–70.  Dr. Haidri diagnosed Plaintiff with post-concussion syndrome, post traumatic headaches, acute cervical, dorsal, and lumbar spine strain, right shoulder injury, and symptoms consistent with bilateral lumbar radiculopathy and bilateral carpal tunnel syndrome.  He prescribed Plaintiff Percocet for the pain.  *Id.* at 170.

On February 15, 2008, Plaintiff was involved in a car accident and treated in the emergency room at Overlook Medical Center in Union County.  *See* AR 156.  On February 18, 2008, he underwent an MRI of the lumbar spine that revealed developmentally slender spinal canal with central spinal stenosis from L2-L3 to L4-L5, minimal to mild neural foraminal narrowing at the L2-L3, L3-L5, L4-L5 level, and an apparent disc protrusion at T11-T12. *See id.* at 166–67.

On February 20, 2008, he sought treatment with Dr. Haidri due to lasting pain from his accidents.  Since the accident, he had daily throbbing headaches, neck pain, local right shoulder pain, numbness of both hands (although his right hand irritated him more than his left hand), mid and low back pain, and paresthesias in both legs.  *See id.* at 164–65.  Dr. Haidri diagnosed Plaintiff with post-concussion syndrome, post traumatic headaches, acute cervical, dorsal, and lumbar sprain, right shoulder injury, and symptoms consistent with left lumbar radiculopathy.  He recommended an MRI and EMG, and prescribed Darvocet.  *Id.* at 165.

On March 6, 2008, Plaintiff sought treatment with Dr. Gregory Lawler for complaints of mid thoracic spine pain as well as pain radiation to the left leg.  Plaintiff explained that he was experiencing a "clicking" and "popping" sensation in his neck since his most recent accident, as well as worsening back and leg pain.  He was feeling "jittery" and experienced headaches and dizziness.  Plaintiff had been working with physical therapy and a chiropractor, but still was

suffering pain.  He was taking Percocet, Flexeril, and Lyrica for pain.  During examination, there was a positive head compression test, which worsened his thoracic spine pain.  There was a slight weak reflex in the right deltoid and tricipital muscle.  Plaintiff's reflexes were 1/4 in the right and left biceps, 2/4 in the brachioradialis, and 1/4 in the triceps bilaterally.  A Spurling test was mildly positive worse on the left with radiation down to Plaintiff's left arm and radiation to the right shoulder.  Plaintiff had tenderness over the right thoracic area, and over the mid low back area.  Plaintiff's straight leg raising was negative bilaterally.  Dr. Lawler diagnosed cervicalgia and lumbalgia, and recommended an MRI.  He felt like Plaintiff's injuries were compounding because of the multiple injuries Plaintiff suffered in 2006, 2007, and 2008.  *See* AR 254–55.

The EMG and nerve conduction testing performed on February 23, 2008, revealed normal electrodiagnostic studies of the lower extremities.  AR at 161–63.  The MRI conducted on March 20, 2008 revealed mild multilevel disc disease and degenerative changes throughout the thoracic spine.  There was a small disc herniation suggested at T5-6 and a small right paracentral disc herniation at T11–12.  *Id.* at 158.

On March 20, 2008, Plaintiff returned to Dr. Lawler for a follow-up examination regarding his low back and thoracic spine pain.  Dr. Lawler found that most of the pain Plaintiff complained of was thoracic pain around the T8-T9 level, which Plaintiff described as a steady and unrelenting pain.  Plaintiff also complained of left buttock and posterior thigh pain.  On examination, Dr. Lawler found that there was tenderness on the L4-L5 facet joint.  He found that there was symptoms of piriformis syndrome on Plaintiff's left side.  Dr. Lawler recommended an epidural steroid injection, and continued the present medication and physical therapy.  *See* AR at 253.

On March 27, 2008, Plaintiff saw Dr. Lawler and discussed his preference to put off the epidural steroid injections.  He was presently taking Percocet 5/325 three to four times a day, Soma three times a day, and would occasionally take a Darvocet that Dr. Haidri prescribed to him.  Dr.

Lawler recommended changing to a long-term sustained released medication and prescribed Kadian 20 mg twice a day.  *See* AR 252.

On April 17, 2008, Plaintiff returned to Dr. Lawler for a follow-up regarding his lower back pain.  Plaintiff felt essentially unchanged from the last time he saw Dr. Lawler.  He felt that the use of Kadian was not covering his back pain.  He was also taking Percocet about eight times a day.  Dr. Lawler cautioned against taking that many Percocet in a day because the excessive amount of acetaminophen that he was ingesting.  Dr. Lawler switched his Percocet to 7.5/325 from 5/325, and added Neurontin.  Although Dr. Lawler counseled Plaintiff on the risks verse benefits of opioid use and the hyperalgesic effects of the medications, Plaintiff stated that he cannot function without the medication to help with the pain.  Dr. Lawler scheduled Plaintiff for a series of thoracic epidural injections.  *See* AR 251.

Plaintiff underwent two MRIs on May 23, 2008.  An MRI of his right shoulder revealed moderate tendinopathy/tendinitis of the supraspinatus tendon and mild associated bursitis.  There was also mild hypertrophic changes within the acromioclavicular joint with mild shoulder impingement.  An MRI of his cervical spine revealed small posterior ridges with moderate disc bulging at C3-C4 and C4-C5 moderately impressing on the anterior thecal sac.  *See* AR 159–60.

On June 5 and 19, 2008, Plaintiff underwent two of the three planned epidural steroid injections to his thoracic spine.  *See* AR 247–50.  On June 26, 2008, Plaintiff had a follow-up examination with Dr. Lawler and reported little, if any, benefit.  He continued to experience pain radiating from his mid back area and form the lower cervical area and high thoracic area.  Dr. Lawler recommended that he may be a candidate for cervical epidural steroid injections based upon the findings of cervical pathology.  On examination, Dr. Lawler found that Plaintiff was alert, but anxious.  Plaintiff's examination remained essentially unchanged from before.  Because Plaintiff's primary care physician was concerned about elevated liver enzymes, Dr. Lawler recommended a

switch from Percocet to Roxicodone 15 mg, as well as remaining on the Kadian and Soma.  AR at 246.

On July 3, 2008, Plaintiff underwent an epidural steroid injection to the cervical spine.  *See* AR 244–45.  He returned to see Dr. Lawler on September 29, 2008, when he reported that he did not feel much benefit from the second thoracic epidural injection.  Dr. Lawler was unable to continue with the third set of injections because of insurance issues.  Plaintiff complained of increasing upper right arm pain.  During the physical examination, Plaintiff was orientated and alert, and his muscular strength and reflexes were essentially within normal limits.  Dr. Lawler instructed Plaintiff to continue taking Kadian and Roxicodone, and increased his Neurontin to 900 mg a day. *See id.* at 243.

During this time, Plaintiff was also treated for gout, and was prescribed Indocin, a drug that is prescribed for the treatment of gouty arthritis.  *See* AR 173, 195, 219.  He complained of exhaustion and fatigue during this time.  *See id.* at 176.

On November 17, 2008, Plaintiff returned to Dr. Lawler for a follow-up examination. Plaintiff stated that his pain was not well relieved.  Dr. Lawler found that he appeared anxious and jittery, and is frustrated and overwhelmed with his chronic pain.  He was taking Kadian and Roxicondone, but Plaintiff felt like the pain medication was providing little help.  He did not want to have any medications increased, because he was concerning about becoming addicted to the medication.  On examination, Dr. Lawler found that there was spasm and tightness in the cervical spine, and limited motion of the cervical spine.  Plaintiff also had spasm and tightness along multiple trigger points.  Dr. Lawler reviewed the MRI, which showed disc bulges in the cervical spine.  He suggested to Plaintiff to undergo cervical spine epidural steroid injections again, and to speak with a psychologist to help deal with the pain.  Dr. Lawler decreased the Neurontin because it did not help with Plaintiff's pain, and also referred him to a physical rehabilitation center.  *See* AR

239.  On December 23, 2008 and January 5, 2009, Plaintiff received two epidural steroid injections to the cervical spine to treat his cervicalgia and disc bulge.  *See id.* at 235–38.

He returned to Dr. Lawler on January 21, 2009 for a full examination after Plaintiff was involved in another car accident on January 19, 2009, where he was rear-ended by another vehicle while he was driving the company van.   Plaintiff, who had been still working at PSE&G, was placed on disability from work.  Plaintiff explained that this most recent accident had worsened his chronic neck pain and his mid low back pain.  Since the accident, the pain in the right-side of his neck—which had been improving—was now radiating into his shoulder.  Plaintiff was taking Kadian and Roxicodone.  Dr. Lawler reviewed all of Plaintiff's MRIs to date, and conducted a physical examination.  Dr. Lawler found that Plaintiff was anxious and jittery the entire examination process.  On examination, he found that Plaintiff had spasm and tightness in the cervical area, tenderness to palpation on the mid spine side, labored flexion and backward bending of the lumbar spine, and an antalgic gait.  He diagnosed Plaintiff with cervicalgia, disc bulging at C3-C4 and C4-C5, disc herniation at T11-T12, lumbalgia, spinal stenosis and degenerative lumbar spine disease.  *See* AR 233–34.  Dr. Lawler recommended that Plaintiff seek counseling for his jitteriness and his agitation.  Dr. Lawler also suggested that he followed up with a psychiatrist for treatment with antidepressant medication, as he felt Plaintiff was depressed.  Dr. Lawler planned to schedule Plaintiff for medial branch blocks on the cervical spine, and referred Plaintiff to his partner, Dr. Thomas Ragukonis, for a possible spinal cord stimulator.  *Id.* at 234.

On February 16, 2009, Plaintiff returned for a follow-up examination with Dr. Lawler.  Plaintiff stated that his pain had decreased greatly since being out of work, and Dr. Lawler found him to be visibly improved with less shaking, stuttering, and anxiousness.  Plaintiff told Dr. Lawler that whenever he gets pain through the day, he was able to rest and use a heating pad, and he felt like his quality of life had improved.  Dr. Lawler stated that Plaintiff had his "100% full support" in

placing him on long-term disability based both on his examination and his clinical findings that there was not one type injection or medication that would help Plaintiff.  AR 232.  Dr. Lawler also planned on tapering down on the medication that Plaintiff was currently taking, particularly the Kadian.  *See id.*

On March 23, 2009, Plaintiff saw Dr. Lawler for his multiple pain complaints.  Dr. Lawler noted that Plaintiff seemed visibly calmer, and less shaky and anxious.  Plaintiff still continued to have neck pain and low back pain.  Dr. Lawler believed that Plaintiff was disabled and supported his long-term disability claim.  *See* AR 231.

On April 20, 2009, Plaintiff returned to Dr. Lawler for a follow-up, in which Plaintiff reported no changes.  Plaintiff informed Dr. Lawler he was in the process of going for behavioral analysis, and Dr. Lawler hoped that Plaintiff would be placed on medication for his apparent depression.  Plaintiff was doing well with the current pain medications he was on, but wished to come off the medication.  Dr. Lawler felt it was too early for this, and supported Plaintiff's long-term disability.  *See* AR 230.

In June 2009, Plaintiff was directed to decrease his dosage of Kadian due to concerns of increased liver enzymes.  *See id.* at 202.

On June 1, 2009, Dr. Lawler examined Plaintiff, who stated that he was having a mix of good and bad days in terms of pain.  While Plaintiff was taking Kadian for his pain, he still needed to take Roxicodone for breakthrough pain and continues to be in pain.  Dr. Lawler stated the complexity of Plaintiff's case due to the multiple injuries Plaintiff has suffered.  On examination, Dr. Lawler found that Plaintiff was anxious and jittery.  Dr. Lawler found that a head compression test worsened thoracic pain.  Plaintiff's reflexes in the upper right extremity were 1/4, and his Spurling's test was mildly positive on the left with radiation down his left arm and his right shoulder.  Dr. Lawler explained how he tried to take Plaintiff off of Percocet, due to his history of

elevated liver enzymes, and offered him steroid injections instead.  When the injections did not ultimately offer Plaintiff much relief from his pain, Plaintiff was put on Roxicodone and an increased dosage of Neurontin.  The Neurontin did not control the pain, and Plaintiff was also taking Kadian but did not wish to take the medication.  Dr. Lawler then recommended a cervical steroid injection, but, during the course of injections, Plaintiff was involved in another car accident.  Dr. Lawler reiterated that he felt that Plaintiff should be on disability.  He noted that Plaintiff had never been a desk worker and he felt Plaintiff's pain would prevent Plaintiff from concentrating and focusing on any type of responsibility.  Dr. Lawler recommended that Plaintiff speak with a psychologist to cope with his concerns.  *See* AR 226–28.  Later, Dr. Lawler issued an addendum to his note and indicated that Plaintiff could sit at a desk for a long time, but he would not be able to concentrate for a long time in any given situation, due to his chronic pain.  *See id.* at 221.

In July 2009, Plaintiff underwent nerve test studies that revealed moderate left S1 radiculopathy and a possible mild right L5 radiculopathy.  *See* AR 212–16.

On July 6, 2009, Plaintiff returned to Dr. Lawler for a follow-up regarding a spike in his elevated liver enzymes.  While Dr. Lawler recommended that Plaintiff stop taking Kadian and Roxicodone in light of the elevated liver enzymes, Plaintiff explained that he could not tolerate daily activities without using medications.  Plaintiff continued to have mid neck pain area, which radiated down his right arm.  Plaintiff stated that this pain, along with the pain in his mid back, was the worst of his pain.  On examination, Dr. Lawler found spasm and tightness of the cervical neck areas and tenderness to palpation along the neck bilaterally and low back.  Plaintiff's reflexes of his lower and upper extremity were essentially normal.  *See* AR 224–25.

Plaintiff returned to Dr. Lawler on July 20, 2009, after being examined by Dr. Lawler's colleague, Dr. Ragukonis.  Dr. Lawler took Dr. Ragukonis's suggestion and scheduled a third thoracic epidural steroid injection.  Plaintiff reported that he was still feeling pain, with occasional

flare-ups.  Dr. Lawler decided to keep Plaintiff on Roxicodone, and ordered him to take two tablets every six hours, instead of one tablet, for severe pain.  *See* AR 204.

On August 7, 2009, Dr. Lawler wrote a note clarifying Plaintiff's medical history and condition, in which he explained that it was his medical opinion that the most recent accident Plaintiff was involved in worsened his neck pain, causing it to radiate into his shoulder in a descending manner, and worsened his mid low back pain.  Dr. Lawler noted that, despite taking narcotic medications of Kadian and Roxicodone, Plaintiff continued to have pain.  Dr. Lawler was going to proceed with another thoracic epidural steroid injection to try to reduce his back pain.  Dr. Lawler recommended a discogram for the neck pain, and advised that Plaintiff continue psychiatric care.  *See* AR 220.

On November 23, 2009, Dr. Lawler administered the thoracic epidural steroid injection.  AR 300.  On February 15, 2010, Plaintiff returned to Dr. Lawler.  Dr. Lawler that Plaintiff appeared to be doing quite well.  Plaintiff reported some mid back pain, and stated that the injection he received "lasted 28 days."  *Id.* at 299.  Plaintiff reported his pain had decreased to a 5/10 from approximately 8/10.  Dr. Lawler noted that this was "quite encouraging," and felt that Plaintiff appeared well-relaxed.  Plaintiff told Dr. Lawler that he is dealing better with his pain and did not have flare-ups.  Plaintiff wished to decrease his medication and Dr. Lawler agreed; accordingly, Dr. Lawler changed his Kadian amount and kept him on Roxicodone.  *Id.*

On March 15, 2010, Plaintiff underwent an epidural steroid injection in his thoracic spine.  AR 297.  Dr. Lawler saw him for a follow-up examination on March 22, 2010, and reported that he felt better but was still feeling a great deal of pain in his back.  Dr. Lawler noted that at one point he felt that if Plaintiff was out on disability his pain would recede; however, Plaintiff was still complaining of pain, particularly in his mid and low back areas.  Dr. Lawler recommended new

MRIs of the lumbar spine, and then a discogram.  Plaintiff explained to Dr. Lawler that he was experiencing little benefit with the Kadian, so Dr. Lawler agreed to wean him off it.  *See* AR 296.

On April 12, 2010, Plaintiff returned to Dr. Lawler regarding his back pain.  Plaintiff had been treated for pancreatitis second to alcohol use and medications.  While Plaintiff was put on Fentanyl and hydromorphone, which helped, Plantiff wished to reduce his medication.  Dr. Lawler agreed to do so, and made a follow-up appointment to see Plaintiff after his MRIs.  *See* AR 295.

Thereafter, in September and October 2010, Plaintiff returned to Dr. Lawler for follow-up examinations.  In both, Plaintiff described the pain as being essentially the same.  Dr. Lawler's plan was to wait for Plaintiff to undergo MRI testing, but Plaintiff had not yet been approved for such MRIs.  *See* AR 293–94. Plaintiff returned in February 2011 for a follow-up evaluation after undergoing new MRIs.  Dr. Lawler believed that Plaintiff did not need surgical intervention but found that Plaintiff had a disc herniation at T9-T10 and disc bulging throughout the spine.  He suggested Plaintiff see a spine surgeon.  *See id.* at 288.   On May 23, 2011, Plaintiff returned to Dr. Lawler.  He reported to Dr. Lawler that his mood and affect have been improved, and he was doing "pretty well."  *Id.* at 287.  Dr. Lawler noted that Plaintiff continued to have the need for narcotics to deal with his pain, and expressed concern about financial issues due to Plaintiff's apparent lack of insurance coverage.  Dr. Lawler stated that he did not believe that injections would provide Plaintiff long-lasting relief and, if surgery was not an opinion, he would send Plaintiff to a pain management center.  *Id.*  On September 26, 2011, Plaintiff returned to see Dr. Lawler.  Dr. Lawler described that Plaintiff no longer had the jitters or the shakes, and appeared to be doing well under the medication. Dr. Lawler, however, did not believe Plaintiff was capable to return to work.  *Id.* at 286.  Finally, on January 30, 2012, Dr. Lawler examined Plaintiff and found that he was doing "pretty well," and was tolerating his medications well.  *Id.* at 285.   Plaintiff stated that "his pain score is approximately 5

to 6/10, though he does have good days, as well as bad days." *Id.* at 285.  Dr. Lawler advised that Plaintiff continue on his current treatment.

      **B.**    ***Consultative Medical Evidence***

          1.    *Dr. Vasudev Makhija*

Plaintiff was examined by Dr. Vasudev Makhija on November 5, 2009 at the request of the Social Security Administration.  After examining Plaintiff, Dr. Makhija found that Plaintiff appeared to be depressed and anxious, but he was orientated as to time, person, and place.  Dr. Makhija found that Plaintiff's thoughts were goal orientated, and noted that he had fine tremors of his hands.  He diagnosed Plaintiff with chronic posttraumatic stress disorder and a depressive disorder not otherwise specified.  *See* AR 257–59.

          2.    *Dr. Jane Shapiro*

On December 17, 2009, Dr. Jane Shapiro, a psychiatrist employed by the New Jersey Division of Disability Determinations, reviewed Plaintiff's file.  She found that Plaintiff had an affective disorder and an anxiety-related disorder.  She found that these impairments imposed "moderate" functional limitations in activities of daily living, social functioning, and in maintaining concentration, persistence, or pace.  She also indicated that there was one or two episodes of decompensation.  AR 260–63.

Dr. Shapiro also completed a mental residual functional capacity assessment.  While Dr. Shapiro found that Plaintiff was not significantly limited in most of the listed mental activities, she found that Plaintiff was moderately limited in (1) the ability to maintain attention and concentration for extended periods; (2) the ability to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to

interact appropriately with the general public; (5) the ability to accept instructions and respond appropriately to criticism from supervisors; (6) the ability to respond appropriately to changes in the work setting; and (7) the ability to travel in unfamiliar places or use public transportation.  *See* AR 264–66.  She concluded that Plaintiff could understand, remember, and execute instructions.  She further stated that Plaintiff could concentrate and respond appropriately to supervision, but not to the general public.  She finally concluded that Plaintiff could adapt to routine change in the workplace.  *Id.* at 266.

### 3. *Dr. Betty Vekhinis*

Dr. Betty Vekhinis examined Plaintiff on May 12, 2010.  Plaintiff's chief complaint was mid back pain, which he rated as a 4-5/10.   On examination, she found that Plaintiff had a normal heel to toe gait, and could squat.  His cervical spine showed no tenderness or muscle spasms, and his ranges were full.  His thoracic spine showed tender paraspinal at T6-10 level.  His lumbar spine revealed forward flexion limited to 40 degrees and limited straight leg raising.  Plaintiff's left shoulder was tender, but not inflamed, and his left elbow was hot, very tender and red.  Ranges of motion were extremely tender, and his grip was reduced due to pain.  Dr. Vekhinis found that Plaintiff had non-radicular thoracic and low back pain.  She found evidence of an acute gouty attack in the left elbow with diminished range of motion and grip strength.  *See* AR 267–68.

### 4. *Dr. James Paolino*

On May 21, 2010, Dr. James Paolino, a physician employed by the New Jersey Division of Disability Determinations, examined Plaintiff's file and completed a physical residual functional capacity assessment.   He opined that Plaintiff could frequently lift and carry ten pounds, could stand and/or walk with normal breaks for at least two hours in an eight-hour workday, could sit with normal breaks for about six hours in an eight-hour workday, and had unlimited ability to push and/or pull, including operation of hand or foot controls.  He found that Plaintiff could occasionally

climb stairs, balance, stoop, and knell, but could never climb a ladder, rope, or scaffold, or crouch, or crawl.  He found Plaintiff was limited in his ability to use his hands for reaching in all directions, for handling, and for fingering.  *See* AR 274–81.

**C.**     ***Testimonial Evidence***

1.     *Plaintiff Bogoski*

On March 16, 2012, Plaintiff testified at a hearing in front of the ALJ.  He testified that he has a driver's license, but has not driven since January 2009 because of his medication and the anxiety he feels when he drives.  Plaintiff described how he suffered pain in his mid back, his neck, his lower back, his legs, as well as lower pain down his legs.  AR 33.  He said that most of his pain is in his mid back, where it "feels like it's a belt around my ribcage all the time," making it feel like it is hard to breathe.  *Id.* at 43.  Plaintiff said that the pain that shoots down his legs, arms, and neck is also bad.  *Id.*  He does experience lower back pain, but the mid back pain is "24/7".  *Id.* at 45.  About once or twice or month, or if he tries to exert himself too much, Plaintiff experiences pain "flare-ups," which he describes as being when "the pain becomes totally unbearable, it's 10 out of 10 and nothing helps."  *Id.* at 47.  Plaintiff stated that he would get a "sharp stabbing" pain in his buttocks that would radiate down both his legs, but particularly his left leg.  *Id.*  He stated that his wrists hurt, and his "hand lock up, cramp up."  *Id.* at 33.  Plaintiff described how if he "writ[es] a letter or something, [his] hands cramp up and they get numb or tingly and it feels like they're burning."  *Id.* at 45.  He also described how he has depression issues and gets migraines about 2-3 times a week for about 4-6 hours at a time. *See Id.* at 33, 44.

Plaintiff described how he had done injections to help with his back pain, but that he currently was in pain management and treating with medication.  He was currently taking Fentanyl, Dilaudid, Xanas, and Nexium. He described that he tried taking Cymbalta for his depression, but he

had a bad reaction to it and stopped taking it.  He explained that he tried seeing a psychiatrist, but could not afford one.  He currently used a TENS Unit two to three times a week.  *See* AR 37.

Plaintiff described a typical day to the ALJ.  He stated that he cannot sleep very well because he cannot get comfortable in bed; accordingly, he will go to bed at 10:00 p.m., but not be able to fall asleep between 5-7:30 a.m.  During the day, he usually lies in the recliner with a heating pad for the majority of the day.  He states that he spends about 95% of the day in the recliner, and cannot do ay other hobbies that he used to enjoy, such as cooking.  He cannot help around the house, or with the kids.  Plaintiff only gets out of the house once every couple of weeks.  He will occasionally leave the house to go on a quick errand with his wife, and his wife does not usually leave him alone with the kids.  He does not leave the house to see friends or attend religious ceremonies, but he will go with his wife to pick up his prescriptions once a month.  He can sit for about twenty minutes without feeling pain, and stand for about ten minutes without feeling pain.  Plaintiff stated that after about fifteen minutes of sitting, his lower back will start to hurt him, and that the pain in his mid back and neck becomes unbearable after twenty minutes, at which point he has to lay down with a heating pad.  He can walk about four blocks before he has a pain flare-up.  He has not been told by a doctor to exercise.  He cannot carry more than eight pounds.  He can bend, but squatting hurts his knees and back.  *See* AR 38–42, 45.  It is difficult for Plaintiff to write for any length of time, because he gets headaches and finds it hard to concentrate.  Plaintiff stated that it was, in general, hard for him to concentrate and perform tasks, and that he has memory loss.  *Id.* at 46.  He can complete tasks if he is given instructions, but he may need several reminders to do the task because it is hard for him to remember to do things.  *Id.* at 46–47.

    2.    *Dr. Martin Fechner*

At the hearing, Dr. Martin Fechner testified as a medical expert.  After reviewing Plaintiff's medical records and listening to his testimony, Dr. Fechner opined that none of Plaintiff's

impairments met the listings described in the listing of impairments.  When asked if Plaintiff had

any functional limitations or restrictions resulting from the impairments he does have, Dr. Fechner

first stated that Plaintiff was experiencing a lot of pain and had a lot of procedures, and had

radiculopathy in the lowers.  Dr. Fechner did feel like there was medical evidence that supported at

least some of the allegations of pain described by Plaintiff.  *See* AR 54–55.  Dr. Fechner agreed that

there was medical evidence of some type of deep tendon reflexes abnormality on the right upper

bicep of Plaintiff based upon the finding by Dr. Sloan that Plaintiff had a 1/4 weakness in the right

bicep and right brachioradialis.  When asked if that would be in accord with Plaintiff's testimony

regarding his inability to use his hands, Dr. Fechner stated that bicep weakness would not really

affect the hands, but if the hands had half the strength of what they should have "then there could be

some problems.  That's correct."  AR 57.  Dr. Fechner then concluded that this finding by Dr. Sloan

would be consistent with Plaintiff's inability to use his hands, but only as to his right hand.  *Id.*  He

also agreed that it was possible that the medication Plaintiff takes could interfere with his ability to

concentrate.  *Id.* at 59.

Overall, Dr. Fechner felt that Plaintiff could do a full range of sedentary activity, lift ten

pounds occasionally, walk and stand in the aggregate of two hours in an eight-hour day, sit for six

hours, and stretch every hours for two or three minutes.  Plaintiff could not use ladders, scaffolding,

or crawl spaces, but he could occasionally bend and crouch.  Dr. Fechner felt that Plaintiff could

rotate his neck to the right and to the left to sixty degrees on a frequent basis.  *See* AR 53.  When the

ALJ questioned him about handling restrictions, such as were indicted in the residual functional

capacity from the DDS level, Dr. Fechner said there was no medical evidence to support any

limitations in handling or fingering.  *Id.* at 64, 65.  Dr. Fechner, however, did say that Plaintiff's

neck problems would affect his overhead reaching, and limited Plaintiff to overhead reaching to

ninety degrees.  He did not think that Plaintiff could work in any occupation that has overhead

reaching.  *See* AR 64–65.

>          3.      *Mr. Rocco Meola*

At the administrative hearing, Mr. Rocco Meola testified as a vocational expert.  The ALJ

posed a hypothetical individual to Mr. Meola of claimant's age, education, and work history, that

could only work in a sedentary capacity, meaning that they could occasionally lift 10 pounds; sit for

six hours and stand or walk for two hours of an eight-hour work day with normal breaks;

occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance,

stoop, and kneel; limited to frequently rotating the neck to sixty degrees to both the left and the

right; limited to reaching to only ninety degrees with both hands; simple routine tasks involving no

more than simple one- or two-step instructions and simple work-related decisions with few

workplace changes.  The ALJ asked if such a hypothetical could perform any work.  Mr. Meola

found that, with such limitations, the hypothetical could work as a table worker, a dial marker, and a

preparer – all sedentary jobs.  He found that there were about 750 such positions in Northern New

Jersey/metro New York area, and 20,000 jobs nationally.  When the ALJ asked if such an individual

could find work if this individual needed to be absent three or four times a month, Mr. Meola

thought that no such individual would be able to find a job.  When asked by counsel if the

hypothetical individual could find an appropriate job if he or she was limited in his or her ability to

handle, manipulate, finger, or reach, Mr. Meola found that there was no such job that the

hypothetical person could perform because all of the jobs he mentioned required some degree of

handling and fingering.

## III.    Standard of Review

A reviewing court must uphold the Commissioner's factual determinations if they are

supported by "substantial evidence."  42 U.S.C. §§ 405(g); 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259,

262 (3d Cir. 2000).  Substantial evidence is "more than a mere scintilla . . . but may be less than a preponderance."  *Woody v. Sec'y of Health & Human Servs*, 859 F.2d 1156, 1159 (3d Cir. 1988). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted).   The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.  *Brown v. Bowen*, 845 F. 2d 1211, 1213 (3d Cir. 1988).

On review, a court must read the evidence in its entirety, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal quotation omitted).  Because the ALJ has an obligation to provide an adequate basis so that the reviewing court can determine whether the administrative decision is based on substantial evidence, ALJ is required to explain clearly his or her reasons for rejecting or discrediting competent evidence when the record shows conflicting evidence.  *See Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981) ("[T]here is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record. We have emphasized our concern in a long line of cases."); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986).  Additionally, the reviewing court is not empowered to weigh the evidence or substitute its conclusions for those of the fact finder. See Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984).  A court, however, cannot "weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).  A court is bound by the ALJ's findings that are supported by substantial evidence "even if [it] would have decided the factual inquiry differently."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

**A.**     *Establishing Disability*

To be eligible for disability insurance benefits ("DIB"), a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A person is disabled for these purposes only if his physical and mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has established a five-step process for determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  For the first two steps, the claimant must establish both (1) that she has not engaged in "substantial gainful activity" (SGA) since the onset of her alleged disability, and (2) that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(b)-(c).  Because the claimant bears the burden of establishing these two requirements, a failure to meet this burden automatically results in the denial of benefits, ending the court's inquiry.  *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5 (1987) (delineating the burdens of proof at each step of the disability determination); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  These first two steps "involve threshold determinations that the claimant is not presently working, and has an impairment which is of the required duration and which significantly limits his ability to work." *Williams*, 970 F.2d at 1180.

In the third step, the medical evidence of the claimant's impairment compared to a list of impairments presumed severe enough to preclude gainful work.  20 C.F.R. § 404.1520(d).  If the claimant's impairment either matches or is equal to one of the listed impairments, he qualifies for

benefits.  Conversely, "[i]f a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to step four and five."  *Plummer*, 186 F.3d at 428.

If the claimant does not have a listed impairment, the Commissioner will evaluate and make a finding about the claimant's Residual Functioning Capacity ("RFC") before proceeding onto the fourth stage.  20 C.F.R. § 404.1520(a)(4), (e).  A claimant's RCF is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Hartranft*, 181 F.3d at 359 n.1 (citing 20 C.F.R. § 404.1545(a)).  "In making a residual functional capacity determination, the ALJ must consider all evidence before him.  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

At the fourth step of the analysis, the Commissioner must analyze whether the claimant's RCF sufficiently permits her to resume her past relevant work.  20 C.F.R. § 404.1520(e)-(f).  The burden remains on the claimant to show that she is unable to perform her past work.  *See Plummer*, 186 F.3d at 428 (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).  If the claimant is capable of returning to her previous line of work, she is not "disabled" and the inquiry goes no further.

If, however, the claimant is unable to return to her former occupation, the evaluation moves to the fifth and final step.  At this stage, the burden shifts to the Commissioner, who now must demonstrate that the claimant is capable of performing other substantial, gainful work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and RFC.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  *See* 20 C.F.R. § 404.1523.  If the Commissioner

cannot satisfy this burden, then the plaintiff is entitled to disability benefits.  *Yuckert*, 428 U.S. at

146–47 n.5.

      **B.**     ***Objective Medical Evidence***

      Under Title II of the Social Security Act, a claimant is required to provide objective medical

evidence in order to prove his disability.  *See* 42 U.S.C. § 423(d)(5)(A).  Consequently, a plaintiff

cannot prove that she is disabled based on solely her subjective complaints of pain and other

symptoms.  *See Hartranft*,181 F.3d at 362 ("Allegations of pain and other subjective symptoms

must be supported by objective medical evidence."); *Green v. Schweiker*, 749 F.2d 1066, 1069–70

(3d Cir. 1984). ("[S]ubjective complaints of pain, without more, do not in themselves constitute

disability.").  Rather, a plaintiff must provide medical findings that show that she has a medically

determinable impairment. 42 U.S.C. §§ 423(d)(1)(A); *Green*, 749 F.2d at 1069-70.

**IV.**   **The ALJ's Decision**

      In a written opinion dated March 29, 2012, the ALJ applied the five-step analysis to the facts

from the record and determined that Plaintiff was not entitled to disability insurance benefits

because Plaintiff had not been under a disability from January 20, 2009 through the date of the

opinion.  *See* AR 11–18.  The ALJ found that Plaintiff satisfied the first step of the analysis because

he had not engaged in substantial gainful activity since January 20, 2009, the alleged onset date.

Moving to step two, the ALJ concluded that Plaintiff had showed severe impairments with his

multilevel disc herniation and back pain, as well as depression.  *See id.* at 13.

      At step three, the ALJ concluded that Plaintiff's impairment did not meet or medically equal

any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ found that

Plaintiff's physical back limitations did not meet the requirements of Listing 1.04—disorders of the

spine.  The ALJ found that the medical evidence did not support a finding of nerve root

compression, spinal arachnoiditis, or lumbar spinal stenosis, which is necessary to establish that the

claimant suffers from a disorder of the spine.  *See* AR 13–14.  The ALJ also found that the severity of Plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.04—affective disorders.  *See id.* at 14.

Before reaching step four, the ALJ concluded that Plaintiff has the RFC to perform sedentary work, except that Plaintiff can occasionally lift ten pounds, six for approximately six hours and stand/walk for two hours of an eight-hour work day, occasionally climb ramps or stairs and occasionally balance or knee.  The ALJ found that Plaintiff could never climb ladders, ropes, or scaffolds, and could never crouch or crawl.  The ALJ also found that Plaintiff had unlimited pull and push ability, but was limited to reaching only ninety degrees with both hands, and was limited to frequently rotating the neck to sixty degrees on both the left and the right.  Plaintiff was also limited to simple routine tasks involving no more than simple instructions and simple work-related decisions with few work place instructions.  *See* AR 15.  In making this determination, the ALF followed the required two-step process.  *Id.*  Accordingly, the ALJ found, after considering the evidence, found that Plaintiff's medical impairments could reasonably be expected to cause the alleged symptoms, but found that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the [RFC]."  *Id.*  In reaching this conclusion, the ALJ considered at length Plaintiff's medical record, and concluded that the objective evidence did not support a finding of total disability by Plaintiff.  In particular, the ALJ noted that Dr. Lawler had indicated in January 2012 that Plaintiff appeared to be doing well, was tolerating medications well, and was feeling less pain.  He also stressed that the orthopedic consultative examination revealed that Plaintiff had normal gait, could walk on his heles and toes, could squat, had no tenderness of the cervical spine, and exhibited full range of motion as well as normal motor and sensory functioning.  The ALJ found that "[d]espite the evidence demonstrating that [Plaintiff] has suffered from medically determinable 'severe' impairments, the

23

evidence also establishes that [Plaintiff] retains the capacity to function adequately to perform many basic activities associated with work." *Id.* at 16.  The ALJ concluded that Plaintiff retains the residual functional capacity to perform sedentary work with some limitations. *Id.*

In analyzing step four, the ALJ found that Plaintiff was unable to perform his past relevant work as a mechanic and laborer. *Id.* at 17.  Finally, at step five, the ALJ considered Plaintiff's age, education, work experience, and RFC, and found that jobs exist in significant numbers in the national economy that Plaintiff can perform.  Therefore, the ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from January 20, 2009, through the date of her decision. *Id.* at 18.

## V.     Discussion

Plaintiff raises several challenges to the ALJ's decision.  First, he argues that the ALJ ignored medical evidence establishing Plaintiff's functional limitations in reaching, handling, and fingering.  Next, Plaintiff argues that the ALJ ignored the opinion of Plaintiff's treating physician, Dr. Lawler, regarding his ability to work.  Plaintiff further argues that the ARJ failed to adequately acknowledge Plaintiff's need for narcotic pain medications.  Finally, Plaintiff asserts that the vocational expert's testimony is unreliable.

### A.     *The ALJ's Determination of Plaintiff's RFC*

#### 1.     *Plaintiff's Functional Limitations*

First, Plaintiff argues that the ALJ ignored medical evidence establishing Plaintiff's functional limitations in reaching, handling, and finger.  It asserts that the ALJ improperly concluded that "it did not appear that there was any medical evidence to support any limitations regarding the use of the hands" because there was treating source and consultative medical records confirming limitations in Plaintiff's hands. *See* Pl.'s Br. at 23 (quoting AR 16).  The Commissioner

asserts that the ALJ reasonably relied upon Dr. Fechner's testimony that Plaintiff's impairments did not impose handling or fingering limitations.  *See* Def.'s Br. at 7.

Plaintiff's argument has merit.  The ALJ has an obligation to consider all of the evidence in front of him or her when making a residual functional capacity determination.  *See Burnett v. Commissioner of SSA*, 220 F.3d 112, 121 (3d Cir. 2000).  "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *Id.*   In other words, "the ALJ's finding of residual functional capacity must be accompanied by a clear and satisfactory explication of the basis on which it rests."  *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001) (internal quotation omitted).  Otherwise, the reviewing court is unable to tell if probative evidence was ignored or not credited.  *See Burnett*, 220 F.2d at 121; *see also Cotter*, 642 F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.").

Here, the ALJ's discussion of Plaintiff's alleged hand impairments was limited to a single statement in which she recognized that Plaintiff "discussed some issues with his hands," but concluded that "it did not appear that there was any medical evidence to support any limitations regarding the use of his hands."  AR 16.  The Commissioner argues that the ALJ was relying on the conclusion of Dr. Fechner, and she very well may have done so.  However, there was medical evidence to support Plaintiff's testimony regarding the pain he felt when he used his hands.  For example, Dr. Sloan evaluation Plaintiff in January 2008 and found diminished sensation at the C5-C6 and C6-C7 dermatomes distribution of the upper extremities, as well as deep tendon reflexes revealing 1/4 weakness in the right biceps and brachioradialis.  Dr. Haidri found that Plaintiff had a slight decreased grip strength in his right hand, that he had numbness in both hands, and that Tinel's

sign was positive over the median nerve of both wrists.  Dr. Haidri also diagnosed Plaintiff with

bilateral carpal tunnel syndrome.  There were also an MRI that revealed moderate

teniopathy/tenditits of the spraspinatus tendon.  Dr. Lawler, Plaintiff's treating physician, had noted

that Plaintiff had 1/4 reflexes in his right upper extremity, and noted that Plaintiff was "jittery" and

"shaky."  Dr. Paolino concluded that Plaintiff was limited in his ability to reach, handle, and finger.

In fact, during the administrative hearing, Dr. Fechner agreed that there was diminished sensory

findings in at least the right hand and that this neurological finding supported a finding of limitation

as to Plaintiff's right hand.

The Court finds that the ALJ's failure to mention and explain this contradictory medical

evidence was error.  *See Burnett*, 220 F.3d at 122; *Cotter*, 642 F.2d at 707.  This is particular true in

light of the vocational expert's testimony that a modification of the ALJ's hypothetical to include

limitations on reaching, handling, and fingering would essentially eliminate any sedentary job.

Accordingly, on remand, the ALJ must review all of the pertinent medical evidence on this point

and explain her rejections and conciliations.

2.      <em>Plaintiff's Subjective Complaints and Pain Medications</em>

Plaintiff also argues that substantial evidential does not support the ALJ's RFC

determination because the ALJ failed to adequately acknowledge Plaintiff's need for narcotic pain

medication, as well as the adverse effects of this medication.  Plaintiff also contends that the ALJ

did not properly consider Plaintiff's subjective complaints of pain.

In evaluating symptoms, the ALJ must consider "all your symptoms, including pain, and the

extent to which your symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence."  20 C.F.R. § 404.1529(a); *see Hartranft*, 181 F.3d at 362

("Allegations of pain and other subjective symptoms must be supported by objective medical

evidence.").  The ALJ is required to "evaluate the intensity and persistence of your symptoms so

26

that [the ALJ] can consider how your symptoms limits your capacity for work." 20 C.F.R. §

404.1529(c); *see also Hartranft*, 181 F.3d at 362 ("Once an ALJ concludes that a medical

impairment that could reasonably cause the alleged symptoms exists, he or she must evaluate the

intensity and persistence of the pain or symptom, and the extent to which it affects the individual's

ability to work."). Because pain can "suggest a greater severity of impairment than can be shown

by objective medical evidence alone," the ALJ must consider other evidence submitted about the

claimant's pain or symptoms, such as "what may precipitate or aggravate your symptoms, what

medications, treatments or other methods you use to alleviate them, and how the symptoms may

affect your pattern of daily living." 20 C.F.R. § 404.1529(c)(3). Overall, the ALJ is tasked with

"determin[ing] the extent to which a claimant is accurately stating the degree of pain or the extent to

which he or she is disabled by it." *Hartranft*, 181 F.3d 362.

An ALJ must give "serious consideration" to a claimant's subjective complaints. *Burns v.*

*Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002). In light of the medical record and other evidence, the

ALJ can "evaluate the credibility of a claimant and . . . arrive at an independent judgment, in light

of [the] medical findings and other evidence, regarding the true extent of the pain alleged." *Cerrato*

*v. Comm'r of Soc. Sec.*, 386 F. App'x 283, 286 (3d Cir. 2010) (internal citations omitted). An ALJ's

credibility determination is a finding of fact, which a court is bound by if the finding is "supported

by substantial evidence in the record." *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (citation

omitted). Like any other aspect of the decision, the ALJ "cannot reject evidence for no reason or

for the wrong reason." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The Third

Circuit mandates:

> (1) that subjective complaints of pain be seriously considered, even where not fully
> confirmed by objective medical evidence; (2) that subjective pain may support a claim
> for disability benefits and may be disabling; (3) that when such complaints are
> supported by medical evidence, they should be given great weight; and finally (4) that
> where a claimant's testimony as to pain is reasonably supported by medical evidence,
> the ALJ may not discount claimant's pain without contrary medical evidence.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (internal quotations and citations omitted).

Here, the ALJ stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." After careful review and consideration of the ALJ's decision, the Court finds that the ALJ's findings did not include satisfactory analysis regarding Plaintiff's subjective complaints about his pain, particularly in light of the type and dosage of narcotic pain medications that Plaintiff was taking to alleviate said pain. The ALJ did not sufficiently analyze and explain the weight he afforded to the medications that Plaintiff was taking, or his subjective complaints of pain, fatigue, and the other limiting effects of Plaintiff's alleged symptoms. The ALJ has an obligation to "consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990); *see also* SSR 96-7p, 1996 SSR LEXIS 4 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *Cotter*, 642 F.2d at 705–06 (explaining that the ALJ must indicate the basis for concluding that testimony is not credible).

In her decision, however, the ALJ's analysis consists almost entirely of a recitation of the evidence in the record, without any accompanying explanation of how each piece of evidence—particularly Plaintiff's subjective complaints and his treatments—factored into the ultimate RFC determination. The Court agrees with Plaintiff that the decision does not adequately analyze the factors listed under 20 C.F.R. § 404.1529(c)(3), including Plaintiff's limited daily activities, any precipitating and aggravating factors; the type and dosage of medications taken by Plaintiff;

measures that Plaintiff takes to relieve his pain; and other factors concerning Plaintiff's functional limitations.  *See also* SSR 96-8p, 1996 SSR LEXIS 5 (stating that an RFC assessment should be based on all relevant case evidence, including "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)").  Without such explanation, the Court is not able to perform a meaningful review to whether and to what degree the ALJ considered Plaintiff's subjective complaints, or to whether it considered the medications that Plaintiff was taking to be indicative of Plaintiff's alleged pain disorder.  Accordingly, the ALJ's RFC determination does not provide this Court with a clear and satisfactory explication of its reasoning and will be remanded on this point.

### B.   *The ALJ's Discussion of the Medical Opinion of Dr. Lawler*

Plaintiff next argues that the ALJ failed to accord the appropriate amount of weight to the opinion of Dr. Lawler, Plaintiff's treating physician.  Specifically, Plaintiff argues that the ALJ ignored Dr. Lawler's belief that Plaintiff was disabled and should not return to work.  Considering, however, that this matter is being remanded, and the ALJ may reach different conclusions as to the impact of Dr. Lawler's treatment notes, there is no need at this point to analyze the ALJ's consideration of the findings of Dr. Lawler.

### C.   *Testimony of the Vocational Expert*

Finally, Plaintiff argues that the Commissioner failed to carry her burden at step five because the testimony of the vocational expert is unreliable.  After the ALJ concluded that Plaintiff could not return to his past relevant work, the ALJ proceeded to step five of the sequential evaluation, where the Commissioner has the burden of determining whether, based upon the claimant's RFC and vocational profile, the claimant can perform other work in the national economy.  *See* 20 C.F.R. § 404.1560(c).  Because Plaintiff's impairments resulted in non-exertional

limitations, the ALJ obtained and relied upon the testimony of the vocational expert to determine the extent to which Plaintiff's non-exertional limitations reduced the job base otherwise available at the sedentary exertional level.  *See* AR 16 (referring to AR 65–67); *see also Sykes*, 228 F.3d at 273 (holding that an ALJ must use the testimony of a vocational expert or other similar evidence to establish the step five burden).

Here, in response to a hypothetical question posed by the ALJ, the vocational expert responded that an individual with the limitations described in the hypothetical could perform:

> Such jobs as a table worker, 739.687-081.  It's sedentary with an SVP of 2.  A dial marker, 729.684-018.  It's sedentary with an SVP of 2.  A preparer, 700.687-082, sedentary with an SVP of 2, are samples of such jobs.

AR 66.  The vocational expert told the ALJ that such jobs existed in numbers of approximately 750 in the Northern New Jersey/metro New York area, and existed in numbers of excess of 20,000 on a national basis.  Taking into account the Medical-Vocational Rule 201.28, as set forth at 20 C.F.R. Part 404, Subpart P, App. 2, as a framework, and based on the testimony of the vocational expert and Plaintiff's RFC, the ALJ concluded that Plaintiff was capable of making a successful adjustment to the other work that exists in significant numbers in the national economy and was not disabled.  *See* AR 18.  Plaintiff argues that the Dictionary of Occupational Titles (DOT) does not contain the code for the table worker position cited by the vocational expert.  While there are other jobs titled "title worker," such as "Title Worker (fabrication)" at 739.687-182, "Table Worker (leather products)" at 783.687-030, and "Table Worker (boot and shoe)" at 739.687-142.  As Plaintiff points out, two of these table worker positions are performed at the light level; accordingly, he asserts that it is unclear what table worker job the vocational expert had in mind when he responded to the ALJ's hypothetical question.  *See* Pl.'s Br. at 29.

Considering that this case is being remanded, it is not entirely necessary for the Court to analyze the reliability of the vocational expert's conclusion.  However, the Court finds that

Plaintiff's argument lacks merit. While it is true that the vocational expert cited an incorrect job code for the position, the vocational expert clearly testified that the table worker position he had in mind was a sedentary position with a specific vocational preparation (SVP) level of 2. *See* AR 66. The only table worker position in the DOT that is performed at the sedentary exertional level, with a SVP of 2, is that which the ALJ correctly identified as table worker, DOT Code 739.687-182. *See* AR 18; *see also* Dictionary of Occupational Titles, *located at* Pl.'s Br. Ex A. The substantive characteristics of this job, DOT Code 739.687-182, are identical to the substantive characteristics of the job identified by the vocational expert, DOT Code 739.688-081, unlike any of the other "table worker" jobs contained within the DOT. Considering that the job codes are simply off by the last three digits and that the one Dictionary entry he meant to mention does not conflict with his description of it, the only reasonable interpretation is that the vocational expert "misremembered and, consequently, misspoke the job titles and codes in question." *Fisher v. Barnhart*, 181 F. App'x 359, 367 (4th Cir. 2006) (finding that a misstatement of a DOT code is not reversible error). The ALJ, in her decision, correctly clarified the expert's error.

"Absent a showing of prejudice, an inaccurate citation by a vocational expert to the DOT does not constitute a basis in itself for invalidating otherwise valid testimony." *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 583 (S.D.N.Y. 2012) (citing *Williams v. Astrue*, 11-CV-023S, 2012 U.S. Dist. LEXIS 46248, at *7-8 (W.D.N.Y. Mar. 30, 2012)). Plaintiff has not provided more than mere speculation as to how the citation to the wrong provision in the DOT has prejudiced him—nor does the Court believe that it actually did, as explained above. Overall, the testimony of the vocational expert is not rendered unreliable or otherwise invalided simply because it included a reference to the wrong DOT code. Accordingly, the Court finds that Plaintiff's argument fails.

**VI.** **Conclusion**

For the reasons set forth above, the case is remanded for further proceedings consistent with this Opinion.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: February 13, 2015